UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – FLINT

IN RE:

ROBOTEK CONTRACTING            Case No. 08-33312-dof
& CONSULTING, LLC,                 Chapter 7 Proceeding
                                             Hon. Daniel S. Opperman
      Debtor.

_____/

Opinion Regarding Objections to Severance and Vacation Pay Claims

Factual Background

From October 2001 until July 11, 2008, Robotek Contracting & Consulting, LLC ("Robotek") was in the business of programming industrial robots. On June 17, 2008, a judgment was entered against Robotek and in favor of Margni, Inc. ("Margni") in the amount of $900,000.00. On July 8, 2008, Margni served a writ of garnishment on Comerica Bank, and Comerica Bank froze Robotek's account. Margni also served writs of garnishment on certain customers of Robotek, resulting in accounts receivable being withheld by those customers. Robotek decided to terminate its operations effective upon the close of business on July 11, 2008.

On July 11, 2008, Robotek issued to its employees a "Notice of Permanent Layoff and Separation Agreement and Full and Final Release" ("Separation Agreement"). The Separation Agreement provided that the employees would be terminated as of July 11, 2008, and it stated:

> Due to the nature of this termination, to reward you for your efforts to make us successful, and to also assist you as you transition to new employment, we are willing to offer you a severance package. Under this package, we are offering each employee being laid-off today with a four weeks' [sic] of their base pay (based on a 40 hour workweek) for each year of service, with partial years to be prorated and with no employee being laid-off on this date to receive less than

1

eight weeks of severance pay. The amount of your severance pay eligibility is provided below.

In exchange for this severance pay, though, we ask that you agree to release us from all claims and the other terms as specified in this letter. If you wish to accept this offer, then please indicate your acceptance by signing in the space provided below on or before July 16, 2008. In addition for you agreeing to this separation package and its terms, as indicated below we will also release you from the restrictions limiting your ability to work for a competitor or client. Due to the fact that we are closing our operations, we no longer believe that there is a legitimate interest at stake which should limit your ability to work for others.

With regard to other termination benefits, the Separation Agreement provided as follows:

Under this arrangement, and except as specifically stated in this letter, you acknowledge and agree that you are not entitled to receive any other benefits or compensation as a terminating employee of the Company under any Company practice, policy, or otherwise, other than: a) your normal compensation for work performed for the period May 31, 2008 through today; b) any earned but unused vacation days as normally payable upon termination, if any; c) any expense payments due to you in accordance with our normal expense payment policies, for the period June 1, 2008 through today; and any retirement contribution required to be made by Robotek on your behalf since its last contribution so made, through today. You further acknowledge that, except as specified in this paragraph, you have been fully and properly compensated for all work through today. Since your termination is a layoff, you may be entitled to receive unemployment compensation. That entitlement, though, may be subject to setoffs required by the State of Michigan and is solely controlled by the rules of the State of Michigan.

On August 17, 2008, Robotek filed its chapter 7 bankruptcy petition. On that same date, Michael Mason was appointed as the chapter 7 trustee. Various former Robotek employees ("Wage Claimants") filed proofs of claims for the amounts owed to them under the terms of the Separation Agreement and sought allowance of their claims as priority claims pursuant to 11 U.S.C. § 507(a)(4). On February 4, 2009, Margni filed objections to the Wage Claimants' claims, but it failed to serve notices of its objections at that time. In December 2010, Margni served the notices of its objections to those claims. A preliminary hearing was held on January 26, 2011, and additional hearings were held on March 30, 2011, May 25, 2011, and October 4, 2011. The only remaining issue with regard to Margni's objections is whether the Wage

Claimants are entitled to payments for earned but unused vacation time under the Separation Agreement.

On November 17, 2011, the Trustee filed objections to the Wage Claimants' claims.[1] The Trustee argues that (1) the claims should be disallowed as priority claims, or, in the alternative, (2) the claims should be prorated and the amount should be reduced to reflect the amount of severance pay that would be attributable to the 180 days prior to the petition date. The Wage Claimants filed a Response to the Trustee's Objections on November 30, 2011. The Court held a status conference on December 6, 2011, and it entered an Order Setting Briefing Deadlines on December 9, 2011. A hearing was held on January 11, 2012, at which the Court heard oral arguments with regard to both the Trustee's and Margni's objections to the Wage Claimants' claims. At the conclusion of that hearing, the Court took those matters under advisement.

## Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 157(a), 157 (b)(1), 1334(a), and E.D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

## Analysis

### A. Trustee's Objections to the Wage Claimants' Claims

11 U.S.C. § 507 sets forth the categories of expenses and claims that are entitled to priority treatment in the distribution of a debtor's estate. Section 507(a)(4) provides that a fourth priority is given to "allowed unsecured claims, but only to the extent of $10,950 for each individual . . . *earned* within 180 days before the date of filing the petition or the date of the cessation of the debtor's business, whichever occurs first, for – (A) wages, salaries, or commissions, including

---

[1] Docket Nos. 238-252.

vacation, severance, and sick leave pay *earned* by an individual."[2]  11 U.S.C. § 507(a)(4) (emphasis added).

The Wage Claimants argue that they are entitled to priority treatment for the full amount of their severance pay up to the $10,950 capped amount.  Focusing on the term "earned" in § 507(a)(4), the Trustee argues that (1) the Wage Claimants' claims should be disallowed because the severance pay agreed to in the Separation Agreement was merely labeled "severance pay," but was actually paid by Robotek in exchange for the expansive release contained in the Separation Agreement, (2) the Wage Claimants' claims should be disallowed as priority claims because the severance pay was not "earned," or (3) if priority treatment is allowed, the Wage Claimants' claims should be prorated and the amount should be reduced to reflect the amount of severance pay that would be attributable to the 180 days prior to the petition date.

(1) Whether the Severance Pay Was Merely Payment for the Release

The Court first considers the Trustee's argument that the severance pay was not in fact severance pay, but it was rather paid by Robotek in exchange for the expansive release included in the Separation Agreement.  In support of his position, the Trustee relies on the fact that Robotek's Employee Handbook did not provide for any severance pay other than unemployment compensation; the fact that the Separation Agreements were given to the employees on July 11, 2008, at the time of termination, and the employees were given time to review, sign, and return the Separation Agreements; and the fact that the Separation Agreement included an expansive release.

The Trustee has not cited, and the Court has not found, any provision in the Employee Handbook regarding severance pay.  Paragraph 5.3 of the Employee Handbook, entitled

---

[2] Effective April 1, 2010, and applicable to case commenced on or after that date, the statutory maximum in 11 U.S.C. § 507(a)(4) was increased to $11,725.  75 Fed. Reg. 8747-48 (Feb. 25, 2010).

4

Unemployment Compensation, states: "If you are laid off or your employment terminates, you may be eligible for unemployment compensation benefits. The Company pays the cost of the benefits by taxes paid to fund the unemployment compensation system." The Trustee urges the Court to read that paragraph to mean that Robotek did not intend to provide any severance pay to its employees. The Court is not persuaded by this argument. There are several paragraphs of the Employee Handbook that provide some instruction regarding the intended scope and application of the provisions in the Employee Handbook. For instance, the Introduction to the Employee Handbook states:

> (1) *The Handbook contains only general information and guidelines. It is not intended to be a comprehensive guide, nor does it address all of the possible applications of, or exceptions to, the general policies and procedures described herein.* For that reason, if you have any questions about the applicability of a policy or practice to you and/or your eligibility for a particular benefit, you should address your specific questions to the management team.
>
> (2) *This Handbook is not intended to be an employment contract, nor is the Handbook intended to imply any type of contractual relationship. Further, the Handbook does not guarantee any fixed terms and conditions of employment. To the contrary, although we will certainly try to keep you informed of changes as they occur, the procedures, practices, policies and benefits described herein may be modified or discontinued at any time with or without prior notice.*
>
> (3) Your employment with Robotek is at-will. This means that your employment is subject to termination by your or the Company at any time, with or without case and with or without notice. Nothing in these policies shall be interpreted to be in conflict with or to eliminate or modify in any way your employment-at-will status. Only the President of the Company has the authority to enter into an agreement for employment for any specified period of time, or to make any agreement contrary to this at-will status. To be enforceable, such agreements, if any, must be in writing and signed by both you and the President of the Company.

(emphasis added). Further, the Verification of Receipt of Employee Handbook asks the employees to acknowledge that they understand "that this Handbook states the Company's policies and practices in effect as of the date of publication, March 2, 2006 . . . [and] that these policies and procedures are continually evaluated and may be amended, modified or terminated

at any time with or without prior notice." It is clear that Robotek did not intend the Employee Handbook to be a static, binding agreement between it and its employees and that Robotek reserved the right to amend, modify, or terminate any of the policies and procedures set forth in the Employee Handbook at any time. In this Court's view, Robotek chose to amend or modify its severance policies and procedures when it chose to terminate its operations and it offered its employees the severance package set forth in the Separation Agreement.

As noted, the Trustee also argues that the timing of the Separation Agreement is indicative of it being compensation for the expansive release included in the Separation Agreement and not indicative of it being in the spirit of a severance package. Paragraph 5 of the Separation Agreement, entitled Your Release of All Claims, states:

> In exchange for the agreements contained in this letter agreement, and to the fullest extent allowed by law, you agree to fully release "Robotek LLC." From any and all claims of every kind, under any legal theory, which you may have had, may now have or may later have involving Robotek LLC, directly or indirectly, through the date that you agree to these terms by signing below.
>
> For the purpose of this letter agreement, any reference to "Robotek LLC" refers to Robotek Contracting & Consulting, LLC, as well as to the past, present and future agents, attorneys, employees, directors, officers, owners, members, insurers, carriers, benefit plans, benefit plan administrators, benefit plan fiduciaries, and the successors and assigns of each, of Roboteck Contracting & Consulting, LLC.
>
> The claims covered by this release include, but are not limited to, those which you may have had, have or may later have with respect to any act or omission taking place on or before the date you sign below, involving: any claims of age, disability or any other form of discrimination under any federal, state or local law (including, but not limited to, the federal Civil Rights Act of 1964, or the Americans with Disabilities Act, or Michigan's Elliott-Larsen Civil Rights Act of 1964, or Disabilities Civil Rights Act or claims under any other statute, regulation or ordinance (including, but not limited to, the federal Employee Retirement Income Security Act), as well as any claims for breach of implied or express contract, any tort, public policy violations, fraud or retaliation, or for attorney's fees, or any other claims which may in any way be related to your employment, or otherwise. Nothing in this release, however, does in any way limit you from pursuing any claim with respect to your right for benefits for work through today

6

> under the Robotek sponsored retirement plan, or any breach of this Agreement (including your right to severance pay and the other amounts specified as possibly being [sic] to you in Paragraph 3, above).

Although the Wage Claimants had to sign the extensive release provision in order to be entitled to the severance pay, the Court is not persuaded by the Trustee's argument. The fact that the Separation Agreement was given to the employees upon termination and that the Wage Claimants were given the opportunity to review the Separation Agreement and possibly seek legal advice prior to signing it do not indicate that the severance pay was merely a disguised payment for agreeing to the release. It is clear from the language of the Separation Agreement and from Robotek's actions that Robotek intended to provide severance pay to its former employees "to reward [them] for [their] efforts to make [Robotek] successful, and to also assist [them] as [they] transition to new employment." The release was simply one of the requirements the Wage Claimants had to agree to in exchange for the severance pay. It is not uncommon for employees to agree to release claims against former employers when they accept a severance package. For those reasons, the Court concludes that the severance pay provided for in the Separation Agreements was not merely consideration for the Wage Claimant's release of all claims against Robotek.

B. <u>Whether the Severance Pay Was "Earned" and Whether It Should be Prorated</u>

The Court next considers the Trustee's arguments that the Wage Claimants' claims should be disallowed as priority claims because the severance pay was not "earned," or that the claims should be prorated and the amount should be reduced to reflect the amount of severance pay that would be attributable to the 180 days prior to the petition date. In support of that argument, the Trustee points to the fact that the Employee Handbook did not provide for any severance pay, that the Separation Agreements were agreed to post-termination, and that the Wage Claimants

did not perform any services after the severance pay claim arose. The Court must first determine the method by which an individual "earns" "severance pay," within the meaning of 11 U.S.C. § 507(a)(4).

The Court must presume every word in a statute to have meaning and effect must be given to all words in a statute "to avoid an interpretation which would render words superfluous or redundant." *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001) (citing *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112, 111 S. Ct. 2166, 115 L.Ed.2d 96 (1991); *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998)).

Confronted with an issue of statutory interpretation, the Court begins with the familiar canon of statutory construction that the starting point for interpreting a statute is its language. "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *United States v. Caldwell,* 49 F.3d 251 (6th Cir.1995). "In construing a federal statute it is appropriate to assume that the ordinary meaning of the language that Congress employed accurately expresses the legislative purpose. *Mills Music, Inc. v. Snyder,* 469 U.S. 153, 164, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985); *Nixon v. Kent County,* 76 F.3d 1381, 1386 (6th Cir.1996). Therefore, "if the words of the statute are unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced, because 'courts must presume that a legislature says in a statute what it means and means in a statute what it says there.' *Hudson v. Reno,* 130 F.3d 1193, 1199 (6th Cir.1997) (citations omitted).

11 U.S.C. § 507 does not define the word "earned." In *Matson ex rel. LandAmerica Fin. Group Inc. v. Alarcon*, the 4th Circuit Court of Appeals recently examined the language of § 507(a)(4) to determine when and how severance pay is "earned." That court stated:

> The interpretation of the word "earned," as it appears in 11 U.S.C. § 507(a)(4), presents an issue of first impression in this Court. While the statute does not define the word "earned," we observe that to "earn" generally means to "receive as equitable return for work done or services rendered," or "to come to be duly worthy of or entitled." *Webster's Third New International Dictionary* 714 (2002). The first of these definitions plainly encompasses the common understanding of the manner in which employees "earn" wages, salaries, and commissions, the three general types of compensation listed in 11 U.S.C. § 507(a)(4)(A). Employees typically receive such compensation in exchange for their employment performance. *See, e.g., In re Public Ledger,* 161 F.2d 762, 770 n. 7 (3d Cir. 1947) (wages are agreed-upon compensation received for services rendered); *In re Gurewitz,* 121 F. 982, 983 (2d Cir. 1903) (same). The triggering events permitting employees to receive wages, salaries, and commissions generally lie within the employees' control upon performance of their work, subject to the terms of the employment agreement.
>
> The word "earned," as used in 11 U.S.C. § 507(a)(4)(A), applies not only to wages, salaries, and commissions, but also to several other types of compensation, including "severance pay." The term "severance pay" is not defined in the statute. However, that term generally is defined as "an allowance usually based on length of service that is payable to an employee" upon termination without cause. *See Webster's Third New International Dictionary* 2081 (2002). The purpose of such severance compensation is to "alleviate the consequent need for economic readjustment" and "to recompense [the employee] for certain losses attributable to the dismissal." *Straus–Duparquet, Inc. v. Local Union No. 3, Int'l B'hood of Elec. Workers,* 386 F.2d 649, 651 (2d Cir. 1967).
>
> In contrast to wages, salaries, and commissions, the triggering events allowing employees to receive "severance pay" lie within the employer's control and its decision both to provide severance compensation and to terminate the employment relationship. Thus, employees do not "earn" "severance pay" in exchange for services rendered as they do when they "earn" wages, salaries, and commissions. Rather, employees receive "severance pay" as compensation for the injury and losses resulting from the employer's decision to terminate the employment relationship. This ordinary understanding of the term "severance pay" is consistent with the stated purpose of the plan in the present case, namely, to assist employees upon termination.

*Matson ex rel LandAmerica Fin. Group Inc. v. Alarcon*, 651 F.3d 404, 408-09 (4th Cir. 2011). That Court ultimately held that "an employee 'earns' the full amount of "severance pay' on the date the employee becomes entitled to receive such compensation, subject to satisfaction of the contingencies provided in the applicable severance compensation plan." *Id*. at 409 (citing *Staus-Duparquet, Inc. v. Local Union No. 3, Int'l B'hood of Elec. Workers*, 386 F.2d 649, 651 (2d Cir. 1967) (explaining that severance pay is not earned from day to day and does not accrue over time)). In response to the trustee's argument that the claims should be prorated, as some courts have allowed with regard to administrative expense claims under 11 U.S.C. § 503(b)(1)(A), the *Matson* court stated:

> Finally, our conclusion is not altered by decisions of our sister circuits addressing the priority treatment of severance compensation in the context of administrative expense claims permitted under 11 U.S.C. § 503(b)(1)(A). Many of those courts have held that severance compensation based on length of employment has priority as an administrative expense of the bankruptcy estate only to the extent that the compensation is based on services provided to the bankruptcy estate after the debtor files for bankruptcy. *See In re Roth Am., Inc.,* 975 F.2d 949, 957 (3d Cir. 1992); *In re Mammoth Mart, Inc.,* 536 F.2d 950, 953 (1st Cir. 1976); *In re Health Main. Found.,* 680 F.2d 619, 621 (9th Cir. 1982); *but see Straus–Duparquet,* 386 F.2d at 651.
>
> As the bankruptcy court explained in its memorandum opinion in this case, however, 11 U.S.C. § 503(b)(1)(A), the current codification of the statute at issue in those other cases, and 11 U.S.C. § 507(a)(4), the statute at issue in this case, are materially different. Section 503(b)(1)(A) does not use the word "earned" or specifically include "severance pay" as a form of wages, salaries, and commissions. Instead, § 503(b)(1)(A) requires a calculation of the value of "services rendered" in a period of time after a debtor files its bankruptcy petition. *See In re Pittston Stevedoring Corp.,* 40 B.R. 424, 427–28 (Bankr. S.D.N.Y.1984) (stating that "earned within" is distinct from "service rendered within" and that "earned" "allows for some variation according to agreement between employers and employees" while "services rendered" does not). Therefore, we remain of the opinion that under 11 U.S.C. § 507(a)(4), an employee "earns" the entirety of his or her severance compensation on the date that the employee becomes entitled to receive such compensation under the applicable severance compensation plan.

10

In support of his position, the Trustee argues that the Court should follow the ruling in *In re Ad Service Engraving Co.*, 338 F.2d 41 (6th Cir. 1964). In that case, a collective bargaining agreement provided that at least one week's notice would be served upon an employee before the employee was terminated. The employees were terminated without receiving that one week notice and they sought a priority claim for the one week of wages in the company's bankruptcy case. The Sixth Circuit Court of Appeals was interpreting Section 64 of the Bankruptcy Act of 1898, which provided a fourth priority to "wages due to workmen, clerks, or servants which have been earned within three months before the date of the commencement of proceedings, not to exceed three hundred dollars to each claimant." That court held that the claim that arose from the bankrupt company's failure to give formal notice of its shutdown was not a claim for wages; rather, it was a claim for damages. It concluded that these claims for damages were not entitled to priority status because these claims were not for wages within the context of Section 64 of the Bankruptcy Act of 1898. *In re Ad Service Engraving Co.*, 338 F.2d 41 at 44. That case can be distinguished from this case. First, the court in *In re Ad Service Engraving Co.* was interpreting and applying the language of Section 64 of the Bankruptcy Act of 1898, which is no longer applicable law. Further, the *Ad Service* court concluded that the claims were not claims for wages; they were claims for damages, which were not entitled to priority treatment under Section 64 for the Bankruptcy Act of 1898. Section 507(a)(4) of the Bankruptcy Code specifically includes severance pay as a form of wages and specifically provides priority status for severance pay. The Trustee's reliance on *In re Ad Service Engraving Co.* is misplaced in this case.

This Court agrees with the conclusion and reasoning of the 4th Circuit Court of Appeals in *Matson* and adopts each in this case. Here, the Court concludes that the Wage Claimants earned the severance pay when they were terminated by Robotek and they signed the Separation

Agreement. As previously discussed, the Court does not find the Trustee's argument that the Employee Handbook did not provide for severance pay to be persuasive and it has concluded that the Employee Handbook was effectively amended or modified by the terms of the Separation Agreement. Neither the fact that the Wage Claimants were not offered the severance pay until the date they were terminated or that the Wage Claimants were given time to review the Separation Agreement and seek legal advice before signing it changes the Court's conclusion. Further, while the amount of severance pay to which the Wage Claimants were entitled under the Separation Agreement was based on the number of years they were employed by Robotek, the Wage Claimants did not earn the severance pay over the course of their employment. As previously discussed, the Wage Claimants earned the entirety of their severance pay when they were terminated by Robotek and they signed the Separation Agreement. For those reasons, the Wage Claimants claims are entitled to priority treatment under 11 U.S.C. § 507(a)(4) in amounts no greater than the maximum amount provided by that statute. Any other conclusion would conflict with the terms of the Separation Agreement and the purpose of the severance pay, which was to "assist [the Wage Claimants] as [they] transition to new employment."

C. <u>Margni's Objection to the Wage Claimants' Claims</u>

The only remaining issue with regard to Margni's objections is whether the Wage Claimants are entitled to payments for earned but unused vacation time under the Separation Agreement. Margni argues that the Wage Claimants are not entitled to payments for earned but unused vacation time under the terms of the Separation Agreement and the Employee Handbook. The Wage Claimants argue that the Wage Claimants are entitled to payments for earned but unused vacation time under the terms of the Separation Agreement because the Separation Agreement modified or amended Robotek's policies regarding earned but unused vacation pay as set forth in

the Employee Handbook. The Court must first decide whether the section of the Separation Agreement regarding earned but unused vacation pay is ambiguous.

Under Michigan law, the goal of contract interpretation is to read the document as a whole and apply the plain language used in order to honor the intent of the parties. *Dobbelaere v. Auto–Owners Ins. Co.,* 275 Mich. App. 527, 529 (2007). "If the language of the contract is clear and unambiguous, it is to be construed according to its plain sense and meaning; but if it is ambiguous, testimony may be taken to explain the ambiguity." *New Amsterdam Cas. Co. v. Sokolowski,* 374 Mich. 340, 342 (1965). A contract is ambiguous if it allows two or more reasonable interpretations, or if the provisions cannot be reconciled with each other. *Meagher v. Wayne State Univ.,* 222 Mich. App 700, 721–722 (1997).

With regard to earned but unused vacation pay, the Separation Agreement states:

> Under this arrangement, and except as specifically stated in this letter, you acknowledge and agree that you are not entitled to receive any other benefits or compensation as a terminating employee of the Company under any Company practice, policy, or otherwise, other than: . . . any earned but unused vacation days as normally payable upon termination, if any . . .

Margni argues that there is no ambiguity and that the Separation Agreement makes it clear that the Wage Claimants would only be entitled to payment for earned but unused vacation days if there was some Robotek policy that allowed for such. Margni also argues that the Employee Handbook set forth Robotek's policy regarding payment for earned by unused vacation pay and that the Employee Handbook clearly does not provide for payment for such upon termination. The Employee Handbook, Section 3.2e, entitled Pay In Lieu of Vacation and Pay upon Termination, states: "No employee will receive, or be entitled to receive, pay in lieu of vacation. No employee will receive, or be entitled to receive, pay for vacation time accrued and unused upon voluntary or involuntary termination of employment." The Wage Claimants argue that

there is no ambiguity in the language of the Separation Agreement and that Robotek modified or amended its policy as stated in the Employee Handbook to allow for the payment of earned but unused vacation days when it entered into the Separation Agreements.

The language of the Separation Agreement with regard to compensation for the earned but unused vacation days is ambiguous. The Separation Agreement states that the Wage Claimants are not entitled to any compensation other than "any earned but unused vacation days as normally payable upon termination, if any." Based on this language alone, there is a question as to what compensation for earned but unused vacation day is "normally payable" by Robotek upon termination. It is clear that the Court must look to some other source, whether it be the Employee Handbook, some past amendment or modification to the Employee Handbook, and/or Robotek's past general practices when it has terminated employees to determine whether the Wage Claimants are entitled to compensation for earned but unused vacation days. The Separation Agreement clearly does not specify how one would determine what compensation for earned but unused vacation days is "normally payable" by Robotek upon termination. Further, there is ambiguity with regard to the "if any" language used in that provision. That language can be read to mean that the Wage Claimants are entitled to compensation for any earned but unused vacation days only if (1) the individual Wage Claimants have earned but unused vacation days remaining at the date of termination, and, if they do not have any earned but unused vacation days, they will not be entitled to compensation; or (2) there is some Robotek policy in existence that would allow for payment of earned but unused vacation days, and, if there is no such policy in existence allowing for such, the Wage Claimants would not be entitled to compensation.

As noted, "[i]f the language of the contract . . . is ambiguous, testimony may be taken to explain the ambiguity." *New Amsterdam Cas. Co. v. Sokolowski,* 374 Mich. 340, 342 (1965). The

Court has concluded that the language regarding vacation pay in the Separation Agreement is ambiguous and that it would be appropriate for the Court to hold an evidentiary hearing to allow the parties to explain the ambiguity.

<u>Conclusion</u>

For the reasons stated above, the Court denies the Trustee's Objections to the Wage Claimants' Claims. An evidentiary hearing will be held on April 11, 2012 at 3:00 p.m. at which the parties will present evidence to explain the ambiguity in the vacation pay provision of the Separation Agreement.

Counsel for the Wage Claimants is directed to submit an order consistent with this Opinion.

.

**Signed on February 28, 2012**
           **_____/s/ Daniel S. Opperman_____**
           **Daniel S. Opperman**
           **United States Bankruptcy Judge**